## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| RONALD BEMIS, on behalf of himself and others similarly situated, | : : : | |
| Plaintiff, | : | CASE NO. 2:25-cv-418 |
| v. | : : | |
| KARMAGREEN, LLC and JAMES P. MORRISSETTE, | : : | |
| Defendant. | : : | |

_____/

## CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY AND PERMANENT INJUNCTIVE RELIEF REQUESTED, DEMAND FOR A JURY TRIAL

Plaintiff, Ronald Bemis ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Defendants, Karmagreen, LLC and James P. Morrissette ("Defendants"). Plaintiff's allegations as to Plaintiff's own actions are based on personal knowledge.  The other allegations are based on counsel's investigation, and information and belief.

## NATURE OF ACTION

1.     This is a case about a business that profits from addiction the same way the Sackler family once did.

2.     Defendants are the inventors, manufacturers, and sellers of a psychoactive drug called tianeptine, or "Tia" for short, which is sold under the

brand "Tianaa." The Tianaa products are sold at hundreds of stores across the United States.

3. Defendants promise the Tianaa products are natural dietary supplements that provide a wide array of mental and social benefits such as "mellow moods" and "energy," and "stress relief."

4. What Defendants do not disclose is that Tianaa contains tianeptine, a full μ-receptor opioid agonist that can lead to severe psychological or physical dependence. In fact, tianeptine shares characteristics with United States Food and Drug Administration (FDA) Schedule II Controlled Substances like morphine, methamphetamine, cocaine, fentanyl, and phencyclidine (PCP).

5. Defendants intentionally formulated Tianaa to be extremely physically and psychologically addictive. As a result, it has high potential for abuse.

6. The addictive nature of the product has, predictably, caused sales to go through the roof. James P. Morrissette, the owner of Karmagreen, LLC and inventor of Tianaa, told a journalist that his company was "selling products with tianeptine fast."

7. This is a class action seeking an injunction shutting down sales of Tianaa, a full refund to class members of all money spent on the product, and/or disgorgement of the substantial profits that Defendants have generated from the

sale of the product.

## **PARTIES**

8.     Plaintiff Ronald Bemis is domiciled in Tinley Park, Illinois and purchased Tianaa in January 2025 at retail stores located in Illinois.

9.     Plaintiff would not have purchased the Tianaa Products if he had known that it was extremely physically and psychologically addictive with a high potential for abuse.

10.    Each Plaintiff reviewed and relied on the product labeling at the time of purchase, and neither of the aforementioned facts regarding the extreme risk of addiction were disclosed.

11.    Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this action that would create a conflict of interest with the proposed class members.

12.    As a result of the addictive nature of the product, Plaintiff is at risk of purchasing the product again.  Therefore, an injunction would benefit Plaintiff in the future by removing from the market a product that is highly likely to trigger addictive behaviors.

13.    Defendant Karmagreen LLC ("Karmagreen"), is a Delaware company with its principal place of business in Cape Coral, Florida.   Karmagreen manufactures, distributes, advertises, and sells the subject product.   Karmagreen

also owns various intellectual property rights to the Tianaa products, including patents and trademarks for Tianaa White, Tianaa Red, and Tianaa Green.

14.    Defendant James P. Morrissette is the president of Karmagreen and is domiciled in Cape Coral, Florida.  Mr. Morrissette is the inventor of Tianaa, and is responsible for the formulation, design, marketing, and labeling of the Tianaa products.

15.    All Defendants designed, manufactured, sold, tested, researched, marketed, distributed, and/or otherwise engaged in acts or omissions which caused harm to Plaintiff and class members.

16.    Mr. Morrisette created and patented the method for forming tianeptine supplements, including, but not limited to, Patent No. US 10,624,902 B1.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed class, have a different state citizenship from Defendants.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this

District, Karmagreen's principal place of business is in this District, and Mr. Morrissette is domiciled in this District.  Defendants' decisions concerning the formulation, marketing, labeling, and sale of the products at issue originated in this District.

## FACTUAL ALLEGATIONS

### I.    Tianeptine is Highly Addictive

19.    Tianeptine is a synthetic tricyclic compound that is used as prescription antidepressant in Europe, Asia, and Latin America.  It comes in various forms, including tianeptine salts (tianeptine sodium and sulfate) and tianeptine free acid.

20.    Tianeptine is a full μ-receptor opioid agonist that binds to and activates opioid receptors in the brain and spinal cord to produce maximal opioid effects.  Other examples of full μ-receptor opioid agonists include heroin, oxycodone, methadone, hydrocodone, morphine, and opium.

21.    Tianeptine causes dependence and addiction by stimulating the release of dopamine in the limbic system of the brain.  This results in users experiencing a euphoric high that carries with it a significant risk of overdose.  Further, tianeptine has a short half-life that can lead to a rapid withdrawal, increasing its risk for addiction and misuse.

22.     In the United States, tianeptine is one of a wide range of substances commonly referred to as a "gas station drug" because it is sold at gas stations, corner stores, bodegas, and mini-marts.  Gas station drugs are typically produced by drug manufacturers or shady laboratories that aim to manufacture products that mimic the effects of well-known illicit substances such as marijuana, cocaine, and opioids.  For this reason, tianeptine products are commonly referred to as "gas station heroin."

23.     In a study conducted by the Centers for Disease Control in the United States regarding tianeptine exposure found a significant increase in calls to U.S. poison control centers relating to tianeptine exposure between 2014 and 2017.  The CDC found that most tianeptine exposures occurred among individuals aged 21-40 who reported neurologic, cardiovascular, and gastrointestinal symptoms, along with symptoms that mimic opioid toxicity.  A substantial number of those calls also reported callers were experiencing clinical effects of withdrawal.

24.     As a part of the study, the CDC issued the following public health warning:



## II.    International and Domestic Regulation of Tianeptine

25.    Following a significant number of tianeptine overdoses, Turkey classified tianeptine as a controlled substance and banned its use.

26.    Similarly, tianeptine is restricted or banned in Armenia, Ukraine, Singapore, Russia, Bahrain, and Italy.

27.    On February 10, 2022, the Food and Drug Administration ("FDA") issued a notice to consumers warning that tianeptine is not approved by the FDA for any medical purpose and that there had been an increase in reports relating to negative reactions to tianeptine.

28.    In February 2024, the Drug Enforcement Administration ("DEA") issued a warning regarding the emerging risks of tianeptine.

29.    Alabama, Florida, Kentucky, Mississippi, Michigan, Minnesota, North Carolina Tennessee, Georgia, Indiana, and Ohio have banned, or severely restricted, the sales of tianeptine,

30.    On March 20, 2025, the Delaware House passed legislation that would classify tianeptine as a Schedule I controlled substance, making it illegal to sell, possess, or distribute tianeptine in Delaware.

I.    **The Tianaa Products**

25.    The subject products at issue in this case are Tianaa Green, Tianaa Red, and Tianaa White:



26.    The Tianaa products marketed and distributed by Defendants are made by combining tianeptine (in the form of tianeptine sodium and/or tianeptine free acid), sakae naa, kava, cytidine diphosphate-choline, and alpha glycerylphosphorylcholine in various percentages.

27.    As discussed above, tianeptine is psychoactive with debilitating effects.

28.    Like opioid products, consumption of Tianaa creates a great risk of addiction, dependency, and painful withdrawal symptoms, among other negative effects.  Indeed, tianeptine shares characteristics with opioids and other Schedule II

Controlled Substances like morphine, methamphetamine, cocaine, fentanyl, and phencyclidine (PCP).

29.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  Users want to stop but cannot.

30.    Substances that act on the opioid receptors, like Defendants' Tianaa products, have a high risk of addiction.  Addiction occurs when the user develops a tolerance to the product that requires the user to consume an increased dose of the active ingredient to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the active ingredient to feel normal and function properly.  When the active ingredient is suddenly taken away or the user tries to stop taking the product, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the product and can be extremely painful and intolerable to the user.

31.    Tianeptine withdrawal symptoms are similar to those of traditional opioid withdrawal.  These symptoms include delirium, autonomic dysfunction, agitation, insomnia, yawning, headache, restlessness, autonomic hyperactivity, nausea, vomiting, tachycardia, hypertension, diarrhea, tremors, excessive sweating, drowsiness, and confusion.

32.    Users typically start substances like tianeptine because of how good it makes them feel, but once addicted, they use tianeptine to avoid the pain and sickness of withdrawal.  Use is no longer about getting high, but about not feeling "sick."

33.    Consumers have communicated that, when they first began taking the Tianaa products, they were largely unaware of the significant, adverse effects and addictive properties of tianeptine.  When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine.  They do not think that Tianaa products sold at gas stations or other local stores will act like an opioid with the same, if not greater, addiction and dependency risks as opioids.  As a result, many unsuspecting consumers have developed, or are at extreme risk of developing, tianeptine dependencies that can cause them serious physical, psychological, and financial harm.

34.    Consistent among the reports of addiction from tianeptine products is a feeling of initial shock when users realized they had become unknowingly addicted and how difficult it was to stop their tianeptine use.  Below are several accounts from the "Quitting Tianeptine" forum on www.reddit.com, where users complained about their addiction to tianeptine products and Tianaa:

> i.    One user wrote: I've been taking Tianeptine pills over a year now, haven't been able to quit for more than a week at a time. The anxiety feelings are the worst for me so I'm not able to wake up without it because I feel the worst feeling in the out of my stomach just waking up and I'd rather die than deal with

it. I don't have subs but I've been trying to taper, plus seems like no matter how many pills I take I can't even get high anymore. I've taken them all but currently taking Tiana and Pegasus. Any advice? Or is it one of those things you just have to power through and suck it up? My family thinks I been clean for three months now since leaving a rehab and I don't want to disappoint them, any help is appreciated. Ps I've never been addicted to anything in my life and I'm about to be 44, anyone considering this don't do it!! Thanks in advance

ii.      Another user shared: I've had an opioid receptor agonist active in my bloodstream nonstop for the last 8 years. Be it pills, kratom, a random script I milked off a doctor, or what have you. 3.5ish years ago I discovered Tianaa Red online and bought it at a gas station when a kratom order got delayed - to my surprise, this legal gas station stuff not only helped the withdrawals... it obliterated them, and made me feel far better than I was prepared for. I switched to tianeptine powder soon after, 1gpd became 2gpd, then 2.5gpd... and the rest, as they say, well - you know the line. [. . .]

Due to source chain issues, losing my job (ultimately because of my addiction), subsequent loss of income, and other reasons, I am - for the first time in literally 8 years - experiencing opioid withdrawals. Yeah, I've gotten a taste of it here and there; brief interdose WDs or that shitty full body RLS us tianeptine sodium addicts are all too familiar waking up with - and have sadly accepted as our new norm; a necessary trade off to receive the ever enslaving relief of that warm rush; the synthetic escape from the void we feel in our hearts in this cold world.

But this right now has been my first journey into the full depths of withdrawals.

I officially ran out of tianeptine sodium last night. Took my last ~130mg dose around 16 hours ago while trying to make the most of my final hours of mental stability by frantically calling different hospitals to ask if they were equipped to treat patients presenting with opioid withdrawal …

iii.    Another user shared: I first tried Tianeptine (in the form of Tianaa Red) on January 9, 2018. I thought nothing of it when the clerk at a small store I once frequented said "it's just like kratom and all that other stuff." Of course, he'd never used such substances and had no real idea of their differing effects. I purchased a bottle (for $40) and wasn't impressed at first, probably because I was already a narcotics addict (hydrocodone, oxycodone) with an incredibly high tolerance (10-15 10mg tablets at a time, sometimes twice a day). When my county in Alabama (Calhoun) locked down the opiate prescriptions in 2016, I jumped onto kratom. When it was scheduled in 2017, I had nowhere to go and could get nothing. So I gave Tianeptine a second chance on January 11 and was hooked.

For two years and eight months (01/11/18 - 08/11/20), I suffered tremendously. The only two times I ever stopped taking Tianeptine was for a week in July 2018 (I was deployed to Maryland, where I couldn't find it) and for 30 days in September/October the same year (I was deployed to South Carolina and couldn't find it there either, but loaded up on kratom). Both of my relapses were because of that famous lie addiction tells us: I'd quit it for that long, so I can control it in moderation. Those are the famous last words before most relapses.

Addiction is the only disease that tells us it's not a disease.

So, for two years and eight months, I spent every penny I made on Tianaa Red, Za Za Red, Tiara, and Tia-Max. I blew through about $30,000 during that time, taking anywhere from 4-6 bottles a day. I maxed out five credit cards, pawned two car titles, got two loans for $5,000 each, had two payday loans (my checking account and my wife's), and ran up a bill (credit) at the store that first introduced me to Tianeptine for over $6,000. I pawned my wedding band and my wife's silver jewelry, stole money from my son, stole money from others (even from my Church's offering plate...twice), and borrowed from every friend I had (losing a few in the process). I'd once read a comment on Reddit wherein someone warned that you'd sell your soul for that stuff. Boy, did I. I even landed in my local ER

12

twice and gained 40+ lbs.

On August 11, 2020, after my wife had left me and my son had stopped speaking to me, I tried twice that Tuesday morning to hang myself. No matter what I did, I could not stop taking Tianeptine. It was the last thing I thought of before going to bed at night and the first thing I thought of every morning. Every day was a struggle to find money to get more, or else the WDs would set in and devastate me. I experienced it all: restless leg syndrome, profuse sweating (sweat that smelled terrible), runny nose, headaches, and severe full-body pain to the extent that it felt like I'd been dropped off a third-floor balcony. I could barely walk. So that morning, I called the Employee Assistance Program (EAP) hotline (I work for the Federal government) and was admitted into a detox unit by 1:30 pm, by which time I'd already consumed one 15-count and one 24-count bottle of Za Za Red. Had I not been admitted, I knew I'd have died by that day's end. August 12th, 2020 was my first day without Tianeptine in Heaven knows how long.

35.    This Internet forum is filled with other accounts like these, and the stories echo each other – well-meaning people were looking to feel better by taking with what they thought was an herbal supplement, only to develop an opioid-like addiction.  This evidence makes clear that Tianaa's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.

36.    Addiction is a disease.  In making consumers addicted to the Tianaa products, Defendants have created an unreasonable health hazard.  At a minimum, Defendants had a duty to fully disclose this fact on the packaging of their products.

**II.    Defendants Marketed the Tianaa Products in A Deceptive Manner**

39.     Defendants marketed the Tianaa products by touting their benefits without sufficient regard to the serious dangers posed by the products.

40.     Defendants' products promise to provide "energy," "rest and stress relief," and "mellow moods."

41.     But Defendants fail to disclose that Tianaa has the same, if not higher, potential for addiction as opioids, should not be taken on a daily basis, will result in opioid-like dependency when taken regularly, and will cause adverse effects upon withdrawal.

42.     Defendants also fail to disclose the numerous side effects and withdrawal symptoms caused by the Tianaa products, including delirium, autonomic dysfunction, agitation, insomnia, yawning, headache, restlessness, autonomic hyperactivity, nausea, vomiting, tachycardia, hypertension, diarrhea, tremors, excessive sweating, drowsiness, and confusion.

43.    The product labeling also promises the Tianaa products are "dietary supplements" that contain "natural products:"



44.    However, tianeptine is a synthetic lab made compound and does not appear in nature.

45.    Moreover, there are no warnings or disclosures on the packaging—or even an asterisk suggesting that purchasers should review the back of the product for more information.

46.    As a direct and proximate result of Defendants' failure to warn of the numerous material facts identified above, many Tianaa users find themselves blindsided by the adverse effects from what unsuspecting users thought was a harmless supplement, especially when they stop taking Tianaa and find themselves facing severe withdrawal symptoms.

47.    Consumers who knew the full truth about Tianaa would not have purchased Defendants' Tianaa products or would have paid less than they did for them.

48.    To make matters worse, Defendants have given Tianaa products out as free samples, with zero warning that the product is significantly addictive, or that continued use may result in severe withdrawal symptoms. The very act of giving out "free samples" signals to consumers that the product is safe and harmless. Without adequate warnings, consumers have no reason not to try the sample. They may even enjoy the effects and continue using the product because they do not believe anything with such substantial addictive potential would not bear some kind of warning.

### III.    Defendants Knew or Should Have Known They Were Selling a Highly Addictive Product

16

49.    As the inventors, marketers, manufacturers, and distributors of Tianaa Defendants occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about Tianaa.

50.    Defendants manufactures the Tianaa products in a specialized lab using highly technical knowledge about tianeptine salts and free acid to compound the tianeptine in their products.  Defendants were and are aware of the addiction risks posed by the Tianaa products.

51.    Indeed, the pharmacological effects of tianeptine have been well-studied, and it is well-established that tianeptine acts on the same μ-opioid receptors in the brain as traditional opioids do, resulting in addictive effects.

52.    Further, there are widespread reports, studies, and regulatory warnings regarding addiction and dependency arising from tianeptine use.

53.    Therefore, Defendants knew, and have intentionally designed the Tianaa products, to prey on users and the great potential for getting addicted to the Tianaa products.  At a minimum, Defendants should have known of this great potential.

54.    Nevertheless, Defendants market the Tianaa products as if they are nothing more than over-the-counter dietary supplements, with packaging appearing as an innocuous dietary supplement, not a product with addictive potential.

55.     Defendants failed to disclose Tianaa's addictive potential because Defendants knew or should have known that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions to Defendants' financial detriment.

56.     Defendants' conduct is immoral, unethical, and contrary to public policy.  The United States has gone through an opiate crisis.  Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosure of the risks and the use of false and misleading packaging and marketing.  That cannot– and should not–stand, at least when Defendants' conduct entails violations of state consumer protection statutes as it does here.

57.     Lest there be any doubt about Defendants' tortious intent, Karmagreen's president and Tianaa's inventor, Mr. Morrissette, created, designed, and marketed Tianaa to sell in markets where another supplement– kratom – is banned.  In 2021, Mr. Morrissette's manufacturing facility drew the attention of the FDA, who sent US Marshals to seize over 207,000 unites of dietary supplements and 34,000 kilograms of bulk kratom from Mr. Morrissette.

58.     On July 2, 2024, the FDA sent Mr. Morrissette a warning letter regarding the Tianaa products following a review of labeling obtained from Defendant's manufacturing facility.  The FDA warned Mr. Morrissette that the

Tianaa products were being illegally introduced or delivered into interstate commerce in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 355(a) and 331(d).

59.     Mr. Morrissette has also been behind litigation challenging rulemaking that would ban or restrict sales of tianeptine.  For example, Mr. Morrissette, through his company Premier Manufacturing Products filed a lawsuit challenging implementation of a rule listing tianeptine as a Schedule II substance in Alabama.  Mr. Morrissette argued that the rule would cause Alabama businesses to suffer financially if they were unable to sell tianeptine products.  He also argued that tianeptine could legally be sold as a dietary supplement because the federal government had not scheduled tianeptine as a controlled substance.

60.     In 2020, Mr. Morrissette also sent a letter to the Alabama Department of Public health arguing that listing tianeptine as a Schedule II drug would hurt supplement manufacturers.

61.     Similarly, when Florida was evaluating regulation for tianeptine, Mr. Morrissette told reporters that he was "selling products with tianeptine fast," and that "a solid percentage" of tianeptine users were "***using it for opiate sensation***."

62.     Defendants had superior knowledge that Tianaa causes the same if not greater, addiction and dependency risks as opioids, because they intentionally designed the product to have that effect.

63.    Defendants were willfully blind to the unlawful and dangerously addictive nature of the subject products, because at a bare minimum, they subjectively believed there was a high probability that the subject products were dangerously addictive, and that the disclaimers on the product labeling either failed to adequately disclose those problems or misleadingly downplayed them. Likewise, Defendants deliberately avoided learning facts concerning the dangers of the subject product.

## CLASS ACTION ALLEGATIONS

64. *Class Definition*: Plaintiff brings this action on behalf all people in the following class and subclass (collectively referred to as "Class Members"):

> a. <u>**Nationwide Class**</u>: all people in the United States who purchased one of the Tianaa products.
>
> b. <u>**Illinois Subclass**</u>: all people who purchased a Tianaa Product in Illinois.

65. Each of the above class definitions is a placeholder that "may be altered or amended before final judgment." Fed. Civ. P. 23(c)(1)(C). Subject to additional information obtained through further investigation and discovery, the foregoing class definitions may be expanded or narrowed by amendment or in the motion for class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

66. Excluded from the putative classes are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family. Also excluded are any claims for personal injury.

67. ***Numerosity.*** Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, each Class or Subclass includes thousands of consumers. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants, their retailers, their agents, or other means.

68. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

    a. Whether Defendants knew or should have known that Tianaa is dangerously addictive;

    b. Whether the dangerously addictive nature of Tianaa is material to a reasonable person;

c. Whether Defendants failed to disclose and concealed the dangerous nature of Tianaa; and

d. Whether Defendants' conduct, as alleged herein, violates the consumer protection laws asserted here.

69. ***Typicality.*** Plaintiff's claims are typical of the claims of the Classes in that Plaintiff and the Classes sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiff and all others similarly situated that the products at issue here can be dangerous.

70. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes. Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed class members.

71. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves

judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

72. Without a class action, Defendants will continue a course of action that will result in further damages to the Plaintiff and Members of the Classes and will likely retain the benefits of their wrongdoing.

## CAUSES OF ACTION

### COUNT I
**Violation Of Illinois Consumer Fraud Act, §§ 815 ILCS 505/1, *et seq.***

118.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

119.   Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide and Illinois Subclass against Defendants.

120.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), §§ 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

121.   Defendants intended that Plaintiff and each of the other members of the Illinois Subclass would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

122.   As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Illinois

Subclass have sustained damages in an amount to be proven at trial.

123.    In addition, Defendants' conduct showed malice, motive, and reckless disregard of the truth such that an award of punitive damages is appropriate.

124.    Plaintiff seeks all relief available under this statutory cause of action, including but not limited to injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed class, pray for the following relief:

A.    Certification of the proposed Classes;

B.    Appointment of Plaintiff as representative of the Classes;

C.    Appointment of undersigned counsel as counsel for the Classes;

D.    A declaration that Defendants' actions complained of herein violated the statutes referenced herein;

E.    For an order finding in favor of Plaintiff and class members on all counts asserted herein;

F.    For an award of injunctive or other equitable relief as is necessary to protect the interests of Plaintiff and the class members, including, inter alia, an order prohibiting Defendants from engaging in the unlawful acts described above;

G.    For actual, compensatory, statutory, nominal, and/or punitive damages in amounts to be determined by the Court and/or jury;

H.    For prejudgment interest on all amounts awarded;

I.    For an order of restitution and all other forms of equitable monetary relief;

J.    For an order awarding Plaintiff and class members their reasonable attorney fees, expenses, and costs of suit.

K.    Orders granting such other and further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a jury trial on all issues so triable.

Dated: May 19, 2025                   Respectfully submitted,

*/s/ Rachel Dapeer*
**DAPEER LAW, P.A.**
Rachel Dapeer, Esq.
Florida Bar No. 108039
rachel@dapeer.com
520 South Dixie Hwy, # 240
Hallandale Beach, FL 33009
Telephone: 954-799-5914


Brittany S. Scott
**SMITH KRIVOSHEY, PC**
(*pro hac vice* forthcoming)
166 Geary Street, #1500-1507
San Francisco, CA 94108
Telephone: (415) 839-4000
Facsimile: (888) 410-0415
E-Mail: brittany@skclassactions.com

*Attorneys for Plaintiff*
*and the Proposed Class*